AO 91 (Rev. 11/82)                                    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>KEN ZHIYI LIANG | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>SA15-260M |

Complaint for violation of Title 18, United States Code, Section 1512(c)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE DOUGLAS F. McCORMICK | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
|---|---|---|
| DATE OF OFFENSE<br>May 7, 2015 - May 15, 2015 | PLACE OF OFFENSE<br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1512(c)]

Beginning on or about May 7, 2015 and continuing to on or about May 15, 2015, in Orange County, within the Central District of California, and elsewhere, defendant Ken Zhiyi LIANG corruptly attempted to obstruct, influence, and impede an official proceeding.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>SCOTT McKIM |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<br>DOUGLAS F. McCORMICK | DATE<br>5/16/2015 |
|---|---|

AUSA JCY   REC: Detention

## AFFIDAVIT

I, Scott McKim, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.  I am a Special Agent for the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE, formerly the United States Immigration and Naturalization Service), Homeland Security Investigations ("HSI") and have been so employed since June 2012. I have been employed by the agency since 1992 and employed as an officer or agent by the same agency since 1997, previously having held the positions of Senior Special Agent, Supervisory Immigration Enforcement Agent, Immigration Enforcement Agent, Deportation Officer, Supervisory Detention and Deportation Officer, Detention Services Manager and Center Adjudications Officer. For the reasons more fully set forth below, I am a "taint agent" (also known as "filter agent") assigned to this case and investigation.

### II. PURPOSE OF AFFIDAVIT

2.  This affidavit is made in support of a criminal complaint charging Ken Zhiyi LIANG ("LIANG") with violations of Title 18, United States Code, Section 1512(c)(2), attempted witness tampering.

3.  This affidavit is intended to show that there is probable cause for the requested complaint and finding of probable cause and does not purport to set forth all of my knowledge of, or investigation into, this matter. Where conversations are referred to herein, they are related in

substance and in part, except where quotation marks are used. Where figures and calculations are set forth herein, they are approximate.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

#### A. Background

5. On March 10, 2015, the Court designated, among others, Long Jing Yi ("material witness Yi"), her husband, Jun Xiao ("material witness Xiao"), Ying Wu ("material witness Wu"), and D.L., as material witnesses in an investigation into the so-called "birthing houses" located in Orange County, and elsewhere. These birthing houses provided services to Chinese nationals, who travelled into the United States from China, for the purpose of giving birth to children so that the children could obtain United States citizenship.

6. Material witnesses Yi, Xiao, Wu, and D.L. all retained LIANG to provide legal representation to them in this matter. Ying Wu and Jun Xiao made their initial appearance before the Court on March 10, 2015 and were released on bond conditions.

On or about Saturday, April 4, 2015, material witnesses Yi and Xiao travelled from the United States to China without Court authorization. HSI agents only discovered that they departed after the flight had taken off because the ticket was purchased at the last minute through a travel agency in China.

7.  Subsequent investigation revealed that LIANG may have assisted material witnesses Yi and Xiao in absconding. Specifically, D.L. had communicated with material witness Yi, who told her the following:

   i.  Material witness Yi and her husband paid $6,000 to LIANG. In exchange, LIANG purchased the plane tickets for them and then accompanied them to the airport for their departure flight to China. LIANG told them that it would be legal for them to depart to China.

   ii. Material witness Yi asked D.L. why D.L. had not yet paid the $6,000 so that she could also return to China.

8.  On the morning of April 15, 2015, material witness Ying Wu, accompanied by her spouse F.G. and infant child, was identified at the Los Angeles International Airport, following check-in for a non-stop flight departing for China.

9.  Upon arrest, material witness Ying Wu asked why she was being arrested and blurted out that her attorney told her it was "OK" to leave. No interview was conducted of material witness Ying Wu, based on the fact that her legal counsel was not present.

10. F.G., however, was interviewed and he indicated that his wife, Ying Wu was the primary contact with LIANG. F.G.

claimed that LIANG had not assisted them in their attempt to depart the United States.

11. On April 17, 2015, material witness Ying Wu was presented before United States Magistrate Judge Douglas McCormick.

12. D.L. was also present during that same hearing.

13. During that hearing, the Court reiterated the seriousness of travel restrictions and the need to comply with the conditions of release.

14. Although the Court appointed new counsel, Edward Welbourn, to represent both material witnesses Ying Wu and D.L., LIANG was also present. Indeed, he made an appearance and attempted to argue, unsuccessfully, against the substitution of counsel. The Court relieved LIANG as counsel for both Ying Wu and D.L.

15. As of this date, we have reviewed numerous lengthy airport surveillance videos from multiple different angles. Due in part, however, to the number and length of these videos, as well as the number of people present in the Bradley International Airport Terminal, this process has not yet been completed, and LIANG has not been identified in the videos.

**B.     Contact With Liang**

   1.   Initial phone calls

16. On May 7, 2015, in the presence of counsel, D.L. agreed to contact LIANG to find out whether he would be interested in smuggling her out of the United States and into China.

17. That same day, D.L. placed a call to LIANG's cellular phone. The call was digitally recorded. LIANG answered the call. D.L. told LIANG that she was contacting him because she was concerned that her visa may be expiring soon. LIANG sounded as if he was busy and indicated that he would call D.L. back later. I gave D.L. a digital recorder to capture any subsequent conversations.

18. All of the subsequent recorded conversations occurred almost entirely in Mandarin Chinese. To date, in part because of the length of these recordings, as well as LIANG's particular speech characteristics and the recording quality, the translator has only been able to provide detailed summaries, which contain some material quotes, in English. Complete translations and transcriptions remain in progress.

19. On May 8, 2015, a 40 minute recorded phone call took place between LIANG and D.L. Below is a summary of that translated conversation:

    a. D.L. expressed concern about her visa expiring. LIANG indicated he could help on the immigration case. D.L. expressed that she would rather leave.

    b. LIANG indicated D.L. could not leave because she was no in possession of her passport. D.L. corrected him and stated that she still had her passport in possession. LIANG responded, "Marvelous!"

    c. They discussed the departure of material witness X.J. and material witness L.Y. LIANG said that although he told

them not to sneak out of the United States, he could not do anything, as it was not considered a criminal act.

    d.    LIANG stated he needed to meet with D.L. face to face where he will "tell her something," but D.L. cannot say that he provided guidance or told her "to do something." LIANG said "we" only can "analyze" her situation.

    e.    LIANG said that going back home is a difficult matter and their conversation may cause him to be in "big trouble." Therefore, we might need to find a "medium," another attorney or someone to "pass messages" because "you (referring to D.L.) cannot say he told her something. LIANG also stated, "I know many things but I cannot tell you all that directly."

    f.    LIANG said that if D.L. says he helped her evade United States procedure, he may face penalty of thousands of dollars, or being charged, as the government is bringing indictments at will.

    g.    LIANG indicated there were two steps. First, "by the book." If not successful, then "we" can do "something sneaky."

    h.    LIANG stated they would need to find a new attorney to replace the current attorney and he would give her a story to tell the attorney.

    i.    LIANG discussed passing messages through others, such as D.L.'s mother, saying it has to be said in person, not over the phone, because they are "very, very sensitive."

    j.    LIANG was evasive about how much money his assistance would cost. He eventually asked D.L. to make an

offer. D.L. replied $6,000 and asked "can you do it?" LIANG responded "yes." D.L. asked LIANG if that amount would allow them (referring to her mother and infant child) to leave, 100 percent. LIANG responded "100 percent."

   k.   D.L. asked LIANG if he is paid in full, would he guarantee D.L., her baby, and mother to leave the country. LIANG responded with "okay." The call ended with a plan to schedule an appointment for a meeting at LIANG's office.

   2.   5/12/2015 Meeting

   20.  On May 12, 2015, D.L. met with LIANG at his office. The meeting was captured on video and audio recording devices. I also listened in to the meeting on a live-audio feed. The following discussion took place:

   21.  LIANG began the meeting by telling D.L. that if she were to attempt now to return to China, she would be handcuffed right away at the airport. LIANG also expressed concern about the possibility that he could lose his bar license.

   22.  LIANG further stated in 30 days, "I show you how Jun Xiao did it-- if you don't tell anybody." He also stated that the other two attorneys' clients also left and they must have known.

   23.  LIANG also stated that it might be easier (to leave) by driving to San Francisco.

   24.  LIANG said there are other ways he has, which are used by political asylum applicants to sneak back into China. Based on my training and experience, I understand that one of the criteria for applicants seeking political asylum in the United

7

States is to establish that the applicant cannot readily return to the native country for fear of persecution. Accordingly, if they desire to return temporarily to their native countries, these applicants need to find ways to exit (and later return into) the United States without being detected.

25. For the additional fee of $1,500 to $3,000, LIANG said he could have D.L. board a plane, without any travel documents. LIANG also stated that those monies would serve as "hush money." These costs did not include the air fare, which would cost an additional $1,200 per person.

26. LIANG again stated he could help D.L.'s mother and her child, but again stated he would be in trouble for helping D.L. LIANG specifically stated that he could not provide a contract or retainer agreement as to this plan.

27. LIANG stated he had a long time partner or cooperator of seven to eight years, who was trustworthy. D.L., however, would not be able to communicate with this person over the phone and instead would have to meet this person to discuss the details.

28. LIANG stated when D.L. leaves (the United States), he would tell her what to tell her government appointed lawyer and he will direct her to another trustworthy lawyer.

29. LIANG said that he would have a friend help D.L., because if LIANG did it directly, he would be arrested.

30. When asked, LIANG was evasive in providing too many details of the plan. He did indicate that there would be two cars taking D.L. to the airport, for which the fee would be

$1,500-$3,000 for the three of them. He repeatedly stated that the other $6,000 was for him only.

31. LIANG admonished D.L. to not tell anybody about this plan. He also directed D.L. to delete the communications on her cellular phone, and that he would maintain that he was not her attorney. LIANG also proposed that they could start using WeChat to communicate. LIANG also insisted that D.L. purchase a cheap prepaid phone to contact him via calls and not text messages.

32. LIANG told D.L. that she should be ready to leave in 10 days.

33. Throughout the conversation, LIANG was persistent in attempts to get some of the payment from D.L. upfront. He claimed that he needed the payment so that he could begin recruiting others to assist in the plan.

34. LIANG proposed for D.L. to leave the United States on May 16, 2015, travel on the 17th, and contact PTS Officer O'Neil on the 18th, after D.L. had arrived in China. LIANG also stated that it would be better if they picked a weekend departure day because "the police are more active on the weekdays. If there is a problem and they call [AUSA] Sandy Leal during the weekday, they can respond quicker."

35. Once the discussion was over, D.L. began to leave LIANG's office. LIANG again inquired about the money, asking about the ability to go directly now to the bank. He further stated she could withdraw (up to) $20,000 at a time inside the bank and these people will need to be paid immediately. LIANG

9

followed her out of the office and again admonished her to purchase a prepaid phone for future communications. After this discussion, D.L. left.

3. 5/14/2015 Meeting

36. On May 14, 2015, D.L. returned to LIANG's office and resumed the discussion regarding departure plans. This meeting was video and audio recorded. I again monitored a live feed of the audio portion. The following discussion took place:

37. LIANG confirmed with D.L. that she desired to return to China.

38. LIANG told D.L. that when she got to China, she should continue to contact "Ida" (PTS O'Neill) for a few weeks. He told D.L. to use Skype or something via the internet so that they cannot detect that she was no longer in the United States.

39. D.L. asked if she and her baby would be safe and if they would be stopped. LIANG responded that they would not be stopped and by giving him $6,000, if things went wrong, she would get some back, or if in legal trouble, he would help.

40. LIANG again discussed the use of a medium (conduit person) again, but when asked by D.L. if she would be arrested, LIANG responded by saying "if you do not want to go the first way, I have another way."

41. LIANG discussed the persons, vehicles, and the additional $2,500-$3,000 required payment for those services. He suggested that D.L. may wait at the airport until evening time and that it would be an overnight project. She would have

followed her out of the office and again admonished her to purchase a prepaid phone for future communications. After this discussion, D.L. left.

3. 5/14/2015 Meeting

36. On May 14, 2015, D.L. returned to LIANG's office and resumed the discussion regarding departure plans. This meeting was video and audio recorded. I again monitored a live feed of the audio portion. The following discussion took place:

37. LIANG confirmed with D.L. that she desired to return to China.

38. LIANG told D.L. that when she got to China, she should continue to contact "Ida" (PTS O'Neill) for a few weeks. He told D.L. to use Skype or something via the internet so that they cannot detect that she was no longer in the United States.

39. D.L. asked if she and her baby would be safe and if they would be stopped. LIANG responded that they would not be stopped and by giving him $6,000, if things went wrong, she would get some back, or if in legal trouble, he would help.

40. LIANG again discussed the use of a medium (conduit person) again, but when asked by D.L. if she would be arrested, LIANG responded by saying "if you do not want to go the first way, I have another way."

41. LIANG discussed the persons, vehicles, and the additional $2,500-$3,000 required payment for those services. He suggested that D.L. may wait at the airport until evening time and that it would be an overnight project. She would have

followed her out of the office and again admonished her to purchase a prepaid phone for future communications. After this discussion, D.L. left.

3. 5/14/2015 Meeting

36. On May 14, 2015, D.L. returned to LIANG's office and resumed the discussion regarding departure plans. This meeting was video and audio recorded. I again monitored a live feed of the audio portion. The following discussion took place:

37. LIANG confirmed with D.L. that she desired to return to China.

38. LIANG told D.L. that when she got to China, she should continue to contact "Ida" (PTS O'Neill) for a few weeks. He told D.L. to use Skype or something via the internet so that they cannot detect that she was no longer in the United States.

39. D.L. asked if she and her baby would be safe and if they would be stopped. LIANG responded that they would not be stopped and by giving him $6,000, if things went wrong, she would get some back, or if in legal trouble, he would help.

40. LIANG again discussed the use of a medium (conduit person) again, but when asked by D.L. if she would be arrested, LIANG responded by saying "if you do not want to go the first way, I have another way."

41. LIANG discussed the persons, vehicles, and the additional $2,500-$3,000 required payment for those services. He suggested that D.L. may wait at the airport until evening time and that it would be an overnight project. She would have

to ride in one car and her mother with the baby in another car, so she would not be inspected.

42. When D.L. expressed some fear and concern about this plan, LIANG told her not to worry, and if something goes wrong, D.L. could deduce his costs, and if she was "not happy, [she] can tell [him]." LIANG assured D.L. that he could get her back to China.

43. LIANG instructed D.L. that she could subsequently tell the government lawyer [unclear if referring to her government appointed attorney, or the AUSA] that her plane ticket was purchased by her husband in China, that her depression flared, and that she woke up in China.

44. Shortly after the meeting began, there were technical problems with the live-audio feed. Because of witness safety concerns, a ruse was created to safely remove D.L. from LIANG's office. Once out of the office, D.L. contacted LIANG via a recorded call and set up another appointment for the morning of May 15, 2015.

    4.   <u>5/15/2015 Meeting</u>

45. On the morning of May 15, 2015, shortly before witness D.L. appeared for the appointment at LIANG's office, D.L. placed a recorded phone call to LIANG. During that call, D.L. asked if she was going to meet the others today. LIANG said yes, "we are going to meet the others today, so hurry."

46. At approximately 11:40 a.m., material witness DL entered LIANG's office. The following is a summary of their

conversation, which was again video and audio recorded, with a live-audio feed.

47. LIANG assured D.L., that even if she was arrested, she would not be in violation of any laws.

48. LIANG told D.L. that he was going to take D.L. to meet "them" (referring to the three co-conspirators) today. He told her not to be afraid, and that they just do not want to meet in his office. He assured her nobody will be in trouble and he just contacted them on WeChat and they said okay.

49. Then LIANG appeared to get on the phone, or some audio device, and is heard saying "we" are ready. He further stated they needed to go someplace quiet with "Americans and wi-fi." There was some additional discussion, apparently with this other party, about meeting at a Starbucks in Corona, near the other party's hotel or where he/she lives.

50. In a reassuring manner, LIANG told D.L. that he would teach her how to say the types of stories regular people would not be able to make up.

51. I then heard sounds consistent with D.L. walking and using a ruse call to D.L. pretending to be D.L.'s mother, confirmed that D.L. was indeed preparing to leave the office with LIANG.

52. At approximately noon, I, along with the other agents, observed LIANG and D.L. leaving LIANG's office and walking towards LIANG's vehicle, a 2012 Nissan Quest minivan, with a license plate previously determined to be registered to LIANG.

53. Just after 12:00, as LIANG and D.L. approached and arrived at LIANG's vehicle, HSI Special Agents identified themselves and placed LIANG under arrest.

  5.   Interview of LIANG

54. LIANG was removed from the parking lot of his office and transported to an offsite staging area, where I read to LIANG his advisement of rights, from a card issued by the Federal Law Enforcement Training Center Legal Division, form SH-1220. Special Agent Ben Shelton was present at the time of this advisement and LIANG indicated he understood his rights and was willing to speak to us and find out more about this situation, but said he reserved the right to invoke at a later time.

55. As I explained our investigation was now potentially leading in the direction of national security, based on his statements that he knew how people could board aircraft without travel documents, LIANG responded that he did not have any connections. I again expressed that I wanted to learn more about persons beyond him in this potential conspiracy. LIANG denied knowing any such persons, and stated he did not have any connections to persons who could make that happen. It became clear at that time during the questioning that he was not going to facilitate a meeting with his claimed co-conspirators awaiting him at the Starbucks in Corona.

56. LIANG was then transported to the HSI Orange County office to complete a more thorough interview and complete the booking process related to the arrest.

57.  Upon arriving at the HSI office, I contacted AUSA Jerry Yang, to advise him of the present situation.  Although I initially had not planned to record the interview with LIANG, AUSA Yang directed me to record the remainder of the interview.  Upon returning to an interview and processing room where LIANG was held, I indicated the desire to record the remainder of our interview.  He wanted to speak "off the record" for a few minutes, but I requested we begin recording and he consented.  HSI Special Agents Jonathan Ruiz and Philip O'Connor were present and a brief summary of an approximately 50 minute interview follows.

58.  LIANG stated that he was approached by D.L. and that she sought immigration assistance.  LIANG stated the Public Defender indicated he could not represent D.L. for the immigration matter.

59.  LIANG commented D.L. was a "pesty" client before and she also still owed him $1,000.  LIANG also admitted that when D.L. displayed the $6,000 cash, he became distracted.

60.  LIANG claimed he did not have any connections to help D.L. escape the country undetected.  Instead, he claimed that it was merely a friend that was going to meet and listen to D.L.'s situation then LIANG would file a motion to reopen and ex parte to request for permission to travel.

61.  When asked about the rationale for no contracts in the current case, LIANG replied that there was no contract signed today, nor a receipt given for the fees, though there were three previous contracts.  LIANG later back pedaled once again,

uncertain of the number of contracts. Specifically, after attempting to confirm that there would be a contract or a ledger balance for the case back in the office, the story changed again. He believed the State Bar might only require a contract for case over $1,000. He then stated that the contract might have just been a verbal one and now he could not recall for certain.

62. When asked about his various plans and scenarios involving alternative airports and multiple vehicles and drivers, as well as weekend versus weekday travel, and night versus overnight travel, LIANG responded that those statements were just "a bit" of him overselling the plan to D.L.

63. LIANG denied making any claims, any promises, or guarantees that he could get D.L. back to China by the end of next week or sooner.

64. LIANG went into further detail about his friend in Corona, whom he claimed had no knowledge that there would be any discussion of attempts to evade U.S. authorities for D.L. to sneak out of the country. LIANG rambled on about how he and this friend had some form of past relationship tied to a political asylum claim, with this friend having had a finger cut off and suffering the loss of his dog being killed back in China. He remained adamant that this individual did not have any of the ties to pull off the scheme that LIANG suggested he could do. LIANG stated that there was no way to help a person escape from the United States without detection. Nonetheless, LIANG stated he wanted to "see if they can do anything for her."

65. LIANG declared at one point that he did not know what D.L. wanted him to do.

### C. Interview of D.L.

66. Because we had monitored the bulk of the live-audio transmission relaying the conversations between D.L. and LIANG, I only briefly interviewed D.L. after checking on her welfare. D.L. told me that LIANG had indeed accepted the $6,000 cash and placed it in a desk drawer in his office.

67. LIANG agreed to take us back into his office to recover the $6,000. Later in the afternoon, on May 15, 2015, we went with LIANG back to his office and recovered the $6,000 cash. The serial numbers matched the numbers of the cash that had been given to D.L. prior to the meeting.

### IV. CONCLUSION

68. Based upon the foregoing information and my training and experience, I believe that there is probable cause to believe that LIANG, has violated Title 18, United States Code, Section 1512(c)(2), attempted witness tampering.

SCOTT McKIM
Special Agent
Immigration and Customs Enforcement
Homeland Security Investigations

Subscribed to and sworn before me this 16th day of May, 2015.

HON. DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

16